UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MARY KELLY,

                         Plaintiff,

          v.

PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

                  Defendant.

No. CV04-1552-MO

OPINION AND ORDER

**MOSMAN, J.,**

       Plaintiff Mary Kelly, a former employee of Digital Equipment Corporation ("Digital"), filed suit against defendant Prudential Insurance Company of America ("Prudential") due to its termination of her long-term disability ("LTD") benefits. Prudential is the claim administrator for Digital's Long Term Disability Plan ("the Plan"). The parties have agreed the cross motions for summary judgment (#25 and #34) should be decided in a bench trial based on the stipulated administrative record, after which the court will issue findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. On de novo review, Ms. Kelly urges the court to reverse Prudential's decision terminating her LTD benefits because she has produced reliable, consistent evidence that she suffers from chronic, progressive, and disabling low back pain. Because the medical evidence and opinions in the administrative record indicated Ms. Kelly could perform part-time sedentary work, Ms. Kelly failed to meet the Plan's definition of "total disability." Therefore, Prudential's termination of Ms. Kelly's LTD benefits was appropriate.

I.      FINDINGS OF FACT

        A.      Employment and LTD Plan

        From 1987 to 1989, Ms. Kelly worked at Digital as a word processing operator.

Administrative Record ("AR") at 10004.  As one of her employment benefits, Ms. Kelly received

an LTD insurance plan under the Employee Retirement Income Security Act of 1973 ("ERISA"),

29 U.S.C. § 1001, *et seq*.  Prior to 1988, Ms. Kelly led an active life training horses and enjoying

outdoor sports.  *Id*. at 10608.

        On April 12, 1989, Ms. Kelly saw Sheryl Sun, M.D., her primary care physician, for the

increasing back pain she began experiencing the previous Fall.  *Id*. at 10609.  Ms. Kelly reported

low energy level and Dr. Sun observed a depressed affect.  *Id*.  Dr. Sun prescribed Motrin, and

recommended exercise and weight loss.  *Id*.

        In June 1989, Ms. Kelly experienced progressively worsening back pain that intensified

with prolonged sitting or standing.  *Id*.  As a result of this pain, she quit working on June 9, 1989

and began receiving short term disability benefits on June 19, 1989.  *Id*.

        On October 25, 1989, orthopedic surgeon Randall Seago, M.D., examined Ms. Kelly for

her complaints of persistent low back pain.  *Id*. at 10611.  Ms. Kelly reported feeling better than

she had four months prior, and characterized her pain as aching and dull rather than sharp.  *Id*. at

10612.  The x-rays revealed a normal alignment and no sign of spondylolysis, and Dr. Seago

diagnosed congenital lumbar spinal stenosis and congenital sacralization of L5.  *Id*. at 10611.  Dr.

Seago also recommended further evaluation with orthopedics or neurosurgery, but he advised her

against surgery.  *Id*. at 10612-13.

B.    Application for Disability Benefits and Prudential's Initial Grant of Claim

On December 11, 1989, after exhausting her benefits under the Digital short term disability plan, Ms. Kelly applied for LTD benefits. *Id*. at 10614. In the Physician's Certificate of Disability, dated February 1, 1990, Dr. Sun indicated that Ms. Kelly suffered from "probable nerve root impingement in [the] lumbar spine." *Id*. at 10605. Dr. Sun opined Ms. Kelly should be able to return to work by June 1990. *Id*.

In January 1990, Prudential approved Ms. Kelly's application for LTD benefits and began paying her a monthly benefit effective December 6, 1989. Pl.'s Conc. St. at ¶ 2. Ms. Kelly continued receiving benefits for approximately nine years from 1989 to 1998. During that period, she underwent periodic evaluation and treatment for her lower back pain, with Dr. Sun supervising most of her care. *See* AR at 10504-42.

On April 2, 1990, Ms. Kelly saw Jorge Huertas, M.D., a neurosurgeon. *Id*. at 10593. He reviewed her x-rays, noting "they were essentially negative except for a normal variant which was a sacrilization of the last lumbar vertibrae." *Id*. Additionally, Ms. Kelly's CT scan "showed very benign bulging of the disks which is also normal with the amount of spasm that this woman has in her back." *Id*. Her MRI merely confirmed old findings, including spondylosis of L4 and L5, "but no other abnormalities." *Id*. Dr. Huertas discussed his findings with Ms. Kelly. He informed her that her back problems were not crippling and could be improved by exercise and physical therapy. *Id*. at 10594. Dr. Huertas concluded Ms. Kelly's disability consists of an inability to sit for a long period of time, but he "did not find any reason for her to have a permanent disability." *Id*.

On August 4, 1990, orthopedic surgeon William Ross, M.D., examined Ms. Kelly. *Id*. at

10302. Dr. Ross's report summarizes Ms. Kelly's complaints of constant pain and discomfort in her back that radiated to her right calf and anterior leg and occasionally to her toes. *Id.* A physical examination revealed 75 percent normal flexion and extension, 90 percent normal rotation and lateral bending with complaints of pain in the lower back, slight flattening of the normal lordotic curve, but no other abnormal curvature. *Id.* Overall, her motion was relatively smooth and synchronous. *Id.* Dr. Ross noted the objective findings on previous studies that, when coupled with her subjective complaints, would seem to constitute limiting factors in doing certain job activities. *Id.* at 10304.

From 1990 to 1997, Ms. Kelly received general medical care from Dr. Sun and other doctors at the Permanente Medical Group. *Id.* at 10190. In February 1991, a whole body scan revealed no abnormalities. *Id.* at 10313. Two other appointments in 1991 showed normal gait, an intact neurological examination, and no spinal tenderness. *Id.* at 10315. Dr. Sun prescribed Trazodone and Prozac for Ms. Kelly's depression. *Id.* at 10316-17. During an office visit on July 22, 1992, Ms. Kelly reported some improvement in her functioning as evidenced by her ability to swim 20-30 minutes daily and to walk 2-3 miles per week. *Id.* at 1320. Exam findings from that visit revealed no spinal tenderness, with tenderness in the right sciatic notch. *Id.*

On November 3, 1993, Ms. Kelly visited Dr. Sun and reported persistent pain in her hips and low back. *Id.* at 10323. Exam findings showed a depressive affect and an unremarkable back exam. *Id.* Ms. Kelly reported she was still walking and swimming on a regular basis. *Id.*

On September 21, 1994, Dr. Sun completed a Functional Capacities Form in which she indicated Ms. Kelly would be capable of performing sedentary work, that is, lifting up to ten pounds and occasionally carrying small articles. *Id.* at 10329. Dr. Sun opined that in an eight-

hour workday, Ms. Kelly could sit for two hours, stand for one hour and walk for one hour, with rests. *Id*. at 10331.  On October 25, 1994, Ms. Kelly saw Dr. Sun and reported daily activities of swimming, walking, and she discussed pursuing her hobbies of gardening and photography. *Id*. at 10332.

On October 18, 1995, Ms. Kelly saw Dr. Sun and complained of recent pain in her left hip and groin area. *Id*. at 10334.  Exam findings revealed a slight tenderness in the left paraspinous area, particularly with flexion. *Id*.  Other problems appeared to be stable. *Id*. at 10335.

On April 29, 1996, Ms. Kelly reported to Dr. Sun improvements in her left hip pain, but also noted ongoing pain spreading to both hips. *Id*. at 10337.  Ms. Kelly also indicated the ability to walk two miles approximately three times per week, swimming on a regular basis, and even training with weights. *Id*.  Exam results were normal. *Id*.

On January 11, 1997, Ms. Kelly consulted with Dr. Ross again.  AR at 10340.  His orthopedic evaluation summarized Ms. Kelly's complaints, including: low back pain that is constant and produces tingling with a pins and needles sensation as well as burning; difficulty lifting, stooping, bending, and any prolonged positioning. *Id*.  Her medical history included one hysterectomy surgery in 1988.  Dr. Ross's physical examination of Ms. Kelly indicated she had a normal gait with level pelvis and shoulders. *Id*. at 10341.  Ms. Kelly demonstrated 65-75 percent normal flexion, 75 percent normal lateral bending, and 90 percent normal rotation and extension.  Dr. Ross noted a tenderness in the right and left SI joint and some lower lumbroscral discomfort. *Id*.  Dr. Ross remarked Ms. Kelly's "subjective complaints are consistent with the objective findings," and he diagnosed chronic low back pain with congenital spinal stenosis. *Id*. at 10342.

Significantly, Dr. Ross opined on Ms. Kelly's functional capabilities:

> [Ms. Kelly] can lift no more than 20 lbs. at a time, and frequently lift or carry objects weighing up to 10 lbs. [She] can stand and walk off and on for a total of six hours in an eight hour day. [She] can occasionally stoop and crouch. [She] has the ability to grasp, hold, and turn objects and has good use of [her] hands and fingers for repetitive hand and finger action.

*Id*. at 10343.

In February 1997, Ms. Kelly advised Prudential that her Social Security benefits had been terminated. *Id*. at 10036. Her social security benefits were reinstated later that year. *Id*. at 10426.

C.    Termination of LTD Benefits

At Prudential's request, Ms. Kelly submitted to an independent medical examination ("IME") with neurologist Barry Mann, M.D., on February 3, 1998. *Id*. at 10542. Dr. Mann conducted a neurologic examination that revealed Ms. Kelly had "normal strength and sensation . . . [h]er range of motion appears to be almost completely normal, with tenderness as she flexes her spine forward to touch her toes." *Id*. at 10543. Additionally, her "lumbar paraspinal muscles are tender and tense to the touch." *Id*. Based on his evaluation, Dr. Mann concluded Ms. Kelly was "clearly suffering from chronic lumbar strain," but given his uncertainty as to the significance of her disc herniation, he recommended an MRI of the lumbar spine to ascertain whether surgery would be appropriate. *Id*. Dr. Mann also recommended that Ms. Kelly should avoid "any employment that would cause her to have to sit for periods longer than a half an hour at a time." *Id*. If the MRI showed no significant change in the herniated disc, then Dr. Mann suggested Ms. Kelly could pursue physical therapy and attempt to return to work subject only to

the limitation that she not sit or stand for more than two hours at a time without a break.  *Id*.

    In February 1998, Prudential sent Dr. Sun a list of questions to help evaluate Ms. Kelly's claim for LTD benefits.  *Id*. at 10537.  Specifically, Prudential asked Dr. Sun to describe Ms. Kelly's ability to return to work in a sedentary position.  *Id*.  Dr. Sun opined that Ms. Kelly could perform some sedentary work in which she could sit for an hour a day, walk for three hours a day and stand for two hours a day, but Ms. Kelly would not be able to perform these tasks continuously.  See Pl.'s Mem. in Supp. of Mot. for Summ. J. at 23 (citing AR at 10537).[1]

    During a telephone call with a Prudential claims representative on June 24, 1998, Ms. Kelly stated she was very limited and was capable of sitting for only 15-20 minutes at one time.  AR at 10038.  In that same conversation, she also revealed that she had recently driven with her sister from San Jose, California, to Oregon.  *Id*.  Prudential then requested that Ms. Kelly undergo another IME, this time with Dr. Becker on September 15, 1998, in San Francisco.  *Id*. at 10039.  Because Dr. Becker's office was approximately 50 miles from Ms. Kelly's home in San Jose, she asked if she could attend an IME somewhere closer.  *Id*.  A Prudential representative explained the company wanted her to see Dr. Becker because he is a "highly respected orthopedist."  *Id*.  When asked if she would have a problem getting to San Francisco, Ms. Kelly said she would not.  *Id*.

_____

    [1]Dr. Sun's handwritten response to Prudential's February 1998 questionnaire is not entirely legible.  AR at 10537.  Therefore, the court relies on plaintiff's reading of Dr. Sun's answer regarding Ms. Kelly's ability to perform sedentary work.  However, the court does not accept plaintiff's assertion that overall, the responses on the questionnaire indicate that Dr. Sun "endorsed [Ms. Kelly's] ongoing total disability."  Pl.'s Mem. in Supp. Mot. for Summ. J. at 23.  Prudential did not inquire as to whether Ms. Kelly was "totally disabled," nor can Dr. Sun's two answers reasonably be construed to support that assertion.  Rather, by responding that Ms. Kelly *could perform* sedentary work, Dr. Sun's response bolsters the contrary conclusion that Ms. Kelly no longer met the Plan's definition of "total disability."

Ms. Kelly sat through the appointment for more than two hours and described her symptoms to Dr. Becker as "nearly constant low back pain" averaging a seven on a scale of one to ten. *Id*. at 10452. She elaborated the pain was sometimes sharp with occasional numbness and feelings akin to a "muscle ache." *Id*. Ms. Kelly also described her activities of daily living: she does almost none of the cleaning or housework, but she does do some vacuuming and a normal amount of laundry. *Id*. For hobbies, she enjoys gardening, reading, and photography. *Id*. at 10452-53. She described a "typical day" entailed four to five hours lying down, often on the floor with her feet in a chair." *Id*. at 10476.

Dr. Becker's physical examination revealed "an excellent lumbar range of motion" including Ms. Kelly's ability "to touch her toes with the knees straight." *Id*. at 10458. Lumbar extension, rotation, and lateral flexion were all well-performed, but "there was mild reported tenderness at the lumbosacral junction and in the sacroiliac joint areas." *Id*. Her hips exhibited a normal range of motion, and Ms. Kelly was able to squat and kneel satisfactorily. *Id*. Dr. Becker also reviewed the previously discussed medical records for Ms. Kelly. In evaluating the MRI studies, Dr. Becker opined they "showed age appropriate degenerative disc changes with focal bulging, as well as L5 sacralization and congenital spinal stenosis." *Id*. at 10468.

Based on the interview, physical examination, and his review of the medical records, Dr. Becker concluded:

> It is my opinion that there is a significant discrepancy between what Ms. Kelly says and believes she can do, on the one hand, and what she does do and is capable of doing on the other. She says pain prevents her sitting more than ten minutes. She drove herself one hour to get to this appointment and sat for over three hours with no apparent increase in pain, leaving the office in the early afternoon to drive (another hour) back to San Jose. She swims

> regularly and maintains moderate aerobic fitness. I am unable to
> discover anything on physical examination which would preclude
> (from a musculoskeletal standpoint) Ms. Kelly from performing
> any sedentary, semi-sedentary or light work for which she is, by
> training qualified.

*Id*. at 10469.

Diagnostically, Dr. Becker opined Ms. Kelly suffered from pain disorder, degenerative

lumbar disc disease with no evidence of nerve root compression, congenital lumbar stenosis, and

congenital L5 sacralization (a condition which is, by itself, usually not painful). *Id*. at 10470.

According to Dr. Becker, none of the last three physical conditions would explain the

incapacitating and disabling symptoms Ms. Kelly reports. *Id*. In light of this discrepancy, Dr.

Becker noted "[h]er subjective symptoms are therefore considerably in excess of hard positive

objective findings which would adequately explain them on a physical basis." *Id*. Dr. Becker

clearly stated he did not find evidence of malingering, but instead concluded that the "functional

overlay in this case is outside of Ms. Kelly's conscious awareness." *Id*. In other words, outside

of the pain disorder, Dr. Becker could not "discover any reason why she would be precluded

from performing her usual and customary work, although she might have (like many of us) some

back pain from time to time." *Id*.

On October 1, 1998, Ms. Kelly underwent psychological evaluation with Dr. Randall

Smith, a psychologist. Based on Ms. Kelly's scores on an MMPI-2, Dr. Smith opined Ms. Kelly

suffered from some underlying somatization in the context of generally healthy psychological

coping resources. *Id*. at 10473.

In a supplemental report dated November 18, 1998, Dr. Becker clarified his findings on

Ms. Kelly's disability. *Id*. at 10447. Because Ms. Kelly's subjective symptoms are "markedly in

excess of hard positive objective findings," Dr. Becker concluded Ms. Kelly suffers from the

psychiatric diagnosis of Pain Disorder. *Id.* at 10448. Under this diagnosis, "any physical

limitations she reports or perceives which would preclude her doing sedentary, semi-sedentary,

or light work are on a psychiatric basis." *Id.*

On November 24,1998, Prudential notified Ms. Kelly that it would be terminating her

benefits, effective January 31, 1999, because she no longer met the plan's definition of "total

disability." *Id.* at 10220. In its notification letter, Prudential explained its decision by pointing

to (1) Dr. Sun's opinion that as of February 1998, Ms. Kelly could perform sedentary work, but

not continuously; (2) Dr. Mann's evaluation in which Ms. Kelly's range of motion was almost

completely normal, *id.* at 10445; (3) Dr. Becker's observation of a significant discrepancy

between her reported capabilities versus actual capabilities; for example, Ms. Kelly reports an

inability to sit for more than 15-20 minutes at a time, but during the appointment with Dr.

Becker, she sat for almost three hours just after having driven for approximately one hour, *id*; and

(4) Dr. Becker was unable to discover any physical basis to preclude her from performing

sedentary work. *Id.*

D.    Internal Appeal

On January 11, 2001, approximately one year after Prudential effectively terminated her

LTD benefits, Ms. Kelly submitted a written appeal to Prudential. *Id.* at 10213-19. In support

of her argument that Prudential's decision was unjustified, Ms. Kelly submitted additional

medical records post-dating the November 1998 notification, a vocational assessment, and an

affidavit describing her limitations. *Id.* at 10189-10202. This evidence is summarized as

follows.

On January 19, 1999, Ms. Kelly saw Dr. Jenkins for an orthopedic consultation. *Id*. at 10350. Dr. Jenkins performed a physical examination in which Ms. Kelly exhibited a "good range of motion and discomfort with range of motion in her back, particularly with lateral bending and with extension. She is able to forward flex much easier." *Id*. In order to conduct a more thorough evaluation, Dr. Jenkins suggested he needed several types of x-rays and an MRI scan of Ms. Kelly's spine. *Id*. On January 21, 1999, an x-ray of Ms. Kelly's lumboscral spine with flexion-extension views revealed "not a significant change in position with flexion-tension." *Id*. at 10352. Other than some retrolisthesis on L5 and S1, the remainder of Ms. Kelly's spine appeared to be "unremarkable." *Id*. On January 24, 1999, a follow up MRI revealed mild to moderate bulging of the disc at L4-5 and moderate to marked central canal stenosis at L5-S1 resulting in the compression of the L5 exiting nerve roots. *Id*. at 10353.

Ms. Kelly also submitted a letter from radiologist Dr. Mahoney dated February 18, 1999. *Id*. at 10354. Dr. Mahoney compared Ms. Kelly's recent diagnostic testing with that done in 1989-1990 and opined there had been a marked progression of Ms. Kelly's degenerative disc disease at L5-S1. *Id*. at 10355. Additionally, Dr. Mahoney noted progression of the lumbar spondylosis with the development of moderately severe foraminal narrowing bilaterally. *Id*.

Ms. Kelly's appeal included a physical capacity evaluation dated April 19, 1999. Based on her capacity to lift ten pounds occasionally and perform certain kinds of repetitive work frequently, Ms. Kelly was assessed by Dave Dery, P.T., with a sedentary physical capacity. *Id*. at 10357. The examining therapist opined that Ms. Kelly would be employable in the sedentary work range with the limitation that she not lift over ten pounds and with the accommodation of allowing her to change positions at will. *Id*. at 10360. Mr. Dery opined Ms. Kelly is able to

tolerate sitting up to 1.5 hours per day, standing and moving up to 1.5 hours per day, and stationary standing up to 30 minutes per day. *Id.*

On July 16, 1999, Ms. Kelly underwent a neurosurgical consultation with Dr. Weinstein whose physical examination revealed normal gait, normal lumbar lordosis with no localized tenderness or vertebral spasms. *Id.* at 10196. Dr. Weinstein noted there was "no clear cut indication for surgical intervention in my opinion." *Id.* His chart notes also indicate Ms. Kelly "walked out of here unhappy and openly angry making it clear that I really was not able to explain anything to her." *Id.*

After further x-rays and review of MRI testing, Dr. Jenkins found discography evidence for "congruent back pain" and lateral flexion. *Id.* at 10375. He discussed invasive options and Ms. Kelly agreed to lumbar fusion. *Id.* On March 8, 2000, Dr. Jenkins performed Ms. Kelly's surgery for anterior lumbar interbody fusion at L4-5 and L5-S1. *Id.* at 10383. Her post-operative follow-up appointments were uneventful in March through September 2000, except she did report a "different" kind of back pain located mostly on the right side of her back and leg. *Id.* at 10197. Ms. Kelly reported walking one mile per day in April 2000. *Id.* In August 2000, x-rays showed satisfactory alignment according to Dr. Jenkins. *Id.* By November 2000, Ms. Kelly reported she could walk two miles on most days. *Id.* at 10241.

On November 1, 2000, Ms. Kelly completed an Activities of Daily Living and Socialization report in which she reported being virtually useless in household chores, and spent most of her day reading, writing, or using her computer to enhance photographs. *Id.* at 10232-38. Additionally, she was now using a cane or walking stick to support herself when moving around for the one to two hours she is mobile per day. *Id.* at 10238. In the pain questionnaire, Ms. Kelly

described a "frequent, sharp, stabbing pain with movement" and stated that lying still could lessen the pain.  *Id*. at 10239.

On December 15, 2000, Kay Hartgrave performed a vocational assessment including a transferrable skills analysis for jobs requiring a sedentary capacity.  *Id*. at 10412.  Ms. Hartgrave concluded Ms. Kelly's physical capacity, when considered with her more pronounced physical limits following surgery, would not allow her to perform for wage or profit the material and substantial duties of any job since November 1998.  *Id*.

On January 24, 2001, Ms. Kelly saw Dr. Anderson, an orthopedic surgeon, at the Back Clinic in Albany, Oregon.  *Id*. at 10207.  Ms. Kelly reported an increase in pain and dysfunction subsequent to her fusion surgery in March 2000.  *Id*.  However, Ms. Kelly also reported she felt like her symptoms were improving.  *Id*.  Dr. Anderson described Ms. Kelly as "extremely sedentary," standing is her most painful position, and she has a limited tolerance for both sitting and standing.  *Id*.  Dr. Anderson's overall impression confirms prior diagnostic results – degenerative disc disease with spinal stenosis, spondylolisthesis, and post-operative decompression.  *Id*. at 10209.

E.    Prudential Reaffirms Termination of LTD Benefits

Prudential sent Ms. Kelly's file, including the medical records and other information submitted by Ms. Kelly after November 1998, to a physician consultant, Gale G. Brown, M.D., for review.  *Id*. at 10190.  Dr. Brown reviewed all the evidence and found it substantiated the diagnoses of degenerative lumbar disc disease with associated spinal stenosis and congenital L5 sacralization, chronic low back pain, and depression.  *Id*. at 10198.  However, the medical documentation did not substantiate musculoskeletal or neurological impairment associated with

Ms. Kelly's low back condition.  *Id*. at 10199.  More specifically, Dr. Brown noted that none of

the examining physicians documented any neurological abnormalities and the neurological

exams produced normal results.  *Id*.  In addition, Ms. Kelly's musculoskeletal examinations

produced objectively normal results as noted by Drs. Sun, Becker, Weinstein, Seago, and Mann.

*Id*.  After listing at least three physicians who released Ms. Kelly for sedentary work, including

Dr. Sun in February 1998, Dr. Brown concluded: "Ms. Kelly had the physical capacity to perform

sedentary work on a full time basis as of January 31, 1999, with accommodation for her

degenerative lumbar spine condition."  *Id*. at 10202.

Based on Dr. Brown's report and other evidence previously considered in November

1998, Prudential reaffirmed its decision to terminate Ms. Kelly's LTD benefits.  *Id*. at 10054-56;

10185-87.

II.    CONCLUSIONS OF LAW

A.    Legal Standard

Currently pending before the court are plaintiff's motion (#25) for summary judgment and

defendant's cross motion (#34) for summary judgment.  Pursuant to *Kearney v. Standard*

*Insurance Company*, the parties have stipulated that the appropriate procedure for resolving this

matter is a bench trial on the administrative record.  175 F.3d 1084, 1090 (9th Cir. 1999) (en

banc) (when a court reviews the administrator's decision de novo, as here, the record that was

before the administrator furnishes the primary basis for review).  The parties have also stipulated

(#30) that the administrative record is complete and furnishes the basis for a bench trial

determination of whether Prudential properly terminated Ms. Kelly's LTD benefits.

Depending on the language of the ERISA plan, a district court reviews a plan

administrator's decision to deny benefits either de novo or for abuse of discretion.  The de novo

standard is the appropriate level of review "unless the benefit plan gives the administrator or

fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of

the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  In this case, the

parties agree the benefit plan does not "unambiguously" state Prudential has discretionary

authority, and therefore, the court should employ the default de novo standard of review.  *See*

*Kearney*, 175 F.3d at 1090.  The court conducted a thorough review and consideration of the

administrative record and the parties' legal arguments.  For the reasons that follow, the court

concludes Ms. Kelly is not entitled to continuing LTD benefits because she does not satisfy the

definition of "total disability" in the LTD plan.

      B.     Disability Determination

      The parties dispute whether the ability to perform part time work precludes a finding of

"total disability" under the terms of the Plan and whether evidence available to Prudential

supported a finding of total disability in 1998.

      1.     Eligibility for LTD Benefits

      Under the Plan's definition, "Total Disability" exists when the following conditions are

met:

      (1)  Due to Sickness or accidental injury, both of these are true:

          (a)  You are not able to perform, for wage or profit, the
               material and substantial duties of *your occupation*.

          (b)  After the Initial Duration of a period of Total
               Disability, you are not able to perform for wage or
               profit the material and substantial duties of *any job*
               for which you are reasonably fitted by your

education, training or experience.  The Initial
Duration is shown in the Schedule of Benefits.

(2)  You are not working at any job for wage or profit.

(3)  You are under the regular care of a Doctor.

AR at 20011 (emphasis added).  Thus, the Plan divides the definition of disability into two

distinct time periods – (1) the first 24 months, during which the employee will receive benefits if

she is "not able to perform, for wage and profit, the material and substantial duties of [her]

occupation"; and (2) after 24 months of benefits have been paid, benefits will continue only if the

claimant is not able to perform for wage or profit the material and substantial duties of any job

for which [the claimant] is reasonably fitted by [her] education, training and experience."  *Id.*

Ms. Kelly argues the term "any job" means full-time employment or is at least ambiguous

thus triggering the rule of *contra proferentum*.   Pl.'s Mem. in Supp. of Mot. for Summ. J. at 36-

39.  She contends that if "any job" is reasonably susceptible to meaning "any full-time job," then

because there is no evidence in the record establishing her ability to perform full-time

employment, she satisfied and continues to satisfy the Plan's definition of "totally disabled."  If

the Plan term "any job" means full-time employment, or if the term is reasonably susceptible to

that interpretation, then the court must evaluate Ms. Kelly's eligibility for LTD benefits in terms

of her capacity to perform full-time work.  If, on the other hand, "any job" includes both part-

time and full-time work such that "any job" is not reasonably susceptible to Ms. Kelly's

interpretation, then the court must analyze her eligibility for LTD benefits in terms of her

capacity to perform part-time work.

(a)    Legal Standard

Under a de novo standard, the court construes terms in ERISA trust agreements like any

other contractual provision, "without deferring to either party's interpretation." *Firestone*, 489

U.S. at 112.  The governing law requires the court to "interpret terms in ERISA insurance

policies in an ordinary and popular sense as would a person of average intelligence and

experience." *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002) (internal

quotation marks and citation omitted); *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1439 (9th

Cir. 1990).  In construing the plan's terms, the rules ordinarily associated with the interpretation

of insurance policies apply.  *Lang v. Long-Term Disability Plan of Sponsor Allied Remote Tech.,*

*Inc.*, 125 F.3d 794, 799 (9th Cir. 1997).  Accordingly, the doctrine of *contra proferentum*

requires the court to construe ambiguities, if there are any, against the plan administrator.  *Id*.

However, the court may "not artificially create ambiguity where none exists.  If a reasonable

interpretation favors the insurer and any other interpretation would be strained, no compulsion

exists to torture or twist the language of the policy." *Evans*, 916 F.2d at 1441 (internal quotation

marks and citations omitted).

(b)    Analysis

Within the context of this Plan, the court interprets the term "any job" in its ordinary and

popular sense to encompass both full and part-time employment.  *See McKenzie v. Gen. Tel. Co.*

*of  Cal*., 41 F.3d 1310, 1317 (9th Cir. 1994) ("The language of the 'any occupation' standard is

not demanding.").  The reasonableness of this interpretation is supported by the significant

distinction the Plan makes in defining "total disability" in the first 24 months versus the

subsequent period.  In the former, the Plan defines "total disability" based on the claimant's

PAGE 17 - OPINION AND ORDER          17

capacity to perform "the material and substantial duties of *your occupation*."  AR at 20011.  After

24 months, the Plan's definition of "total disability" requires the claimant to establish he or she is

incapable of performing not just her own regular occupation but "the material and substantial

duties of *any job* for which you are reasonably fitted by your education, training, or experience."

*Id*.  One of the rules of policy interpretation is that the Plan "should be interpreted to give

meaning to all of its terms, presuming that every provision was intended to accomplish some

purpose, and that none are deemed superfluous."  *Allen v. Honeywell Ret. Earnings Plan*, 382 F.

Supp. 2d 1139, 1165 (D. Ariz. 2005) (internal quotation marks and citation omitted).  Here, a

reasonable interpretation should give meaning to the distinction between the two periods

contemplated by the Plan – a covered employee who is forced by total disability to stop working

in her normal occupation will be covered for 24 months, but after that point, her eligibility for

benefits turns on a more stringent requirement of not being capable of performing *any job,* even

if it differs from her normal occupation.  The plain language also uses a different adjective for the

respective periods – the claimant's *occupation* is the focus of the first 24 months, while the wider

universe of any *job* is the focus of the period after 24 months.

The opinions of several federal courts are in accord.  *See Brigham v. Sun Life Canada*,

317 F.3d 72, 83-84 (1st Cir. 2003) (the term "any occupation" means physically unable to work,

even on a part-time basis); *Bond v. Cerner Corp.*, 309 F.3d 1064, 1067 (8th Cir. 2002)

(claimant's part-time work barred her from establishing that she could not continuously perform

the substantial and material duties of "any occupation" and therefore she was not totally

disabled); *Ladd v. ITT Corp.*, 148 F.3d 753, 754 (7th Cir. 1998) ("As long as the worker can

engage in 'substantial gainful activity,' he is not disabled even if the only work that he is capable

of doing is only part time."); *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 185-86 (1st Cir.

1998) (although a claimant's capacity "may have been limited to part-time work," this did not

compel the conclusion that he was "totally disabled" where the plan defined that term as being

when a claimant is "completely prevented from engaging in any occupation."); *Graeber v.*

*Hewlett Packard Co. Employee Ben. Org. Income Prot. Plan*, 421 F. Supp. 2d 1246, 1254 (N.D.

Cal. 2006) (plan's "any occupation" provision means that "in order to be considered Totally

Disabled, a [m]ember must not be able to work at all, not even part time."); *Shane v. Albertson's*

*Inc. Employees' Disability Plan*, 381 F. Supp. 2d 1196, 1205 (C.D. Cal. 2005) (where plan

required claimant be "incapable of performing 'any and every duty of any gainful occupation,'"

the claimant's ability to perform part-time work would be a sufficient disqualifier); *Mullaly v.*

*First Reliance Standard Life Ins. Co.*, 253 F. Supp. 2d 279, 283 (D. Conn. 2003) ("In the absence

of clear language permitting part-time employment, courts have uniformly declined to consider a

claimant, who is capable of working part-time, eligible for benefits under a general disability

policy.").

Ms. Kelly contends the Plan's term "any job" is ambiguous because it is reasonably

susceptible to more than one meaning.  She cites *Ellis v. Egghead Software Short-Term & Long-*

*Term Disability Plans*, 64 F. Supp. 2d 986 (E.D. Wash. 1999), for the proposition that "[t]he law

recognizes that an employee who is able to work only *part-time* satisfies the requirement of being

'unable to perform the substantial and material duties' of her own or another appropriate

occupation."  Pl.'s Mem. in Supp. of Mot. for Summ. J. at 36.  Like the plan at issue here, the

court in *Ellis* confronted a plan where after 24 months, "a participant may continue to receive

benefits only if he is disabled from working in '*any occupation*.'"  *Id.* at 989 (emphasis added).

PAGE 19 - OPINION AND ORDER          19

The record in *Ellis* revealed the claimant was continuously drowsy, unable to perform the most simple physical tasks, unable to stand, sit, or walk for more than one hour, and unable to work more than 15 hours per week. *Id*. at 995. The court concluded the claimant was "disabled from *all occupations*," and satisfied the plan's definition of total disability. *Id*. (emphasis added). Because there was no record evidence the claimant actually could perform part-time work, *Ellis* does not stand for the proposition that a claimant is totally disabled despite his ability to perform part-time work in any occupation.

Furthermore, two factors dilute the persuasiveness of *Ellis* in this case – (1) the record was "relatively quiet" regarding the claimant's capacity after 24 months to perform any occupation as opposed to his own physically demanding occupation; and (2) evaluations by two physicians indicated the claimant was "unable to work" and the vocational analyst agreed the claimant was "unable to participate in any type of gainful activity." *Id*. (internal quotation marks and citation omitted). Ms. Kelly's administrative record is neither quiet on her ability to perform part-time work after 24 months, nor does it contain any medical or vocational evidence from the relevant time period indicating she is unable to participate in any type of job. Thus, *Ellis* does not support Ms. Kelly's interpretation that "any job" is reasonably susceptible to meaning "any full-time job."

Ms. Kelly also argues an ambiguity exists because the language "reasonably fitted by your education, training, or experience" in the second clause means that "any job" should be restricted to jobs comparable to her prior job which, in her case, was a full-time position. Pl.'s Mem. in Supp. of Mot. for Summ. J. at 37. I reject this reading because it inserts a requirement of "full-time work" into the second clause that is not supported by the plain meaning of the broad

category "any job."  Ms. Kelly argues the case law supports her position because "[c]ourts have determined that in applying the phrase 'reasonably fitted by education, training, or experience,' the claim administrator must demonstrate the existence of a job the claimant is capable of and qualified to perform and which is comparable in terms of remuneration."  *Id*. at 37 (citing *Mossa v. Provident Life & Cas. Ins. Co.*, 36 F. Supp. 2d 524, 531 (E.D.N.Y. 1999); *Mizzel v. Paul Revere Life Ins. Co.*, 118 F. Supp. 2d 1016, 1021 (C.D. Cal. 2000); *Hoffert v. Commercial Ins. Co. of Newark*, 729 F. Supp. 201 (S.D.N.Y. 1990)).  Ms. Kelly's argument is incorrect because the law in this circuit is clear – the "plan administrator is not required in every case where the 'any occupation' standard is applicable to collect vocational evidence in order to prove there are available occupations for the claimant."  *McKenzie*, 41 F.3d at 1317.

The court's interpretation gives meaning to the Plan's use of the phrase "any job for which you are reasonably fitted by your education, training, or experience."  In the context of the Plan, this language is reasonably read to impose on the plan administrator the reality-based requirement that a claimant who could theoretically perform a different job should not be removed from the classification of "totally disabled" when that claimant either lacks the training or is substantially over-qualified for the position.  In this case, Ms. Kelly's capacity to perform part-time work with restrictions to avoid prolonged sitting or standing allows for the exact same type of employment in word processing for which she already has experience and training, but would simply entail fewer hours.  That she may earn less money in a part-time position does not change the fact that she is capable and qualified to perform that job, nor does it make the Plan's language susceptible to meaning a claimant is "totally disabled" as long as she does not earn wages commensurate with her prior position.  The court will not "torture or twist the language"

of the Plan to support Ms. Kelly's strained interpretation.  *See Evans*, 916 F.2d at 1441.

Because "any job" is not reasonably susceptible to being limited to mean full-time

employment, the next step requires the court to analyze Ms. Kelly's eligibility for LTD benefits in

terms of her capacity to perform part-time work.  If the record establishes she can perform part-

time work, Ms. Kelly is not "totally disabled" under the Plan.

        2.      Did the Evidence Available to Prudential Demonstrate That Ms. Kelly
                    Was Totally Disabled in November 1998?

Ms. Kelly takes issue with Prudential's consideration of treating physician Dr. Sun's

opinion, the apparent disregard for the Social Security Administration's determinations of

disability, the lack of weight given to MRI and x-ray evidence showing marked progression in

her degenerative disc disease, and Prudential's misplaced reliance on the reports of Drs. Becker

and Brown.  In response, Prudential contends the weight of the medical evidence demonstrates

that Ms. Kelly did not satisfy the Plan's definition of disability because her condition did not

prevent her from "working at any job for which [she was] reasonably fitted by [her] education,

training and experience."

Unlike social security cases, the plan administrators in the ERISA context are not

required to "accord special deference to the opinions of treating physicians."  *Black & Decker

Disability Plan v. Nord*, 538 U.S. 822, 830 (2003).  At the same time, ERISA plan administrators

"may not arbitrarily refuse to credit a claimant's reliable evidence."  *Id.* at 834.  According to Ms.

Kelly, Prudential failed to credit the reliable opinions of her treating physician, Dr. Sun, who

continuously endorsed Ms. Kelly's "ongoing disability."   Pl.'s Mem. in Supp. of Mot. for Summ.

J. at 23.  This argument is not supported by Dr. Sun's chartnotes, which indicate the following:

PAGE 22 - OPINION AND ORDER        22

(1) from 1991 to 1992, no abnormalities were discovered in a whole body scan, she had an intact neurological exam, no spinal tenderness, but some evidence of tenderness in the right sciatic notch; (2) in 1993, Dr. Sun noted Ms. Kelly's back exam was "unremarkable"; (3) in 1994, Dr. Sun opined Ms. Kelly would be capable of performing sedentary work at least four hours per day; (4) 1996 exam results were normal and Ms. Kelly reported increased activity in swimming and walking up to two miles; and (5) in 1998, Dr. Sun opined Ms. Kelly could perform some sedentary work for six hours per day with restrictions to avoid prolonged sitting or standing.

There is no indication Prudential arbitrarily refused to credit Dr. Sun's opinions. Rather, in its notification letter terminating Ms. Kelly's benefits, Prudential explained its decision by relying in part on Dr. Sun's opinion in 1998 that Ms. Kelly could perform sedentary work with certain restrictions. AR 10220. To the extent Dr. Sun diagnosed Ms. Kelly with progressive degenerative disc disease with spinal stenosis, Prudential did not reject this diagnosis, but instead terminated her benefits because her condition under that diagnosis did not prevent her from performing part-time sedentary work. Although the medical evidence supports the fact that Ms. Kelly has a medical diagnosis, this "does not by itself establish disability" and Prudential's treatment of Dr. Sun's opinions was appropriate. *Jordan v. Northrup Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004).

The remaining objective medical evidence preceding Prudential's November 1998 decision overwhelmingly supports the conclusion that Ms. Kelly did not meet the Plan's definition of "total disability." Between 1990 and 1998, at least four doctors examined Ms. Kelly, yet none of their opinions or diagnostic exams revealed evidence establishing "total disability" under the Plan. First, despite evidence of sacralization and some very benign disc

PAGE 23 - OPINION AND ORDER          23

bulging, the x-rays, MRIs and CT scans reviewed by Dr. Huertas indicated essentially normal results and provided "no reason for her to have a permanent disability."  Second, a physical examination performed by orthopedic surgeon Dr. Ross in 1990 revealed relatively smooth and synchronous motion overall, with 75 percent normal flexion and extension and 90 percent normal rotation.  Again in 1997, Dr. Ross found the same results as well as normal gait, but given her subjective complaints, he diagnosed chronic low back pain and congenital spinal stenosis.  Third, a neurologic exam conducted by Dr. Mann revealed Ms. Kelly had normal strength, sensation, range of motion, with tenderness as she flexes.  Dr. Mann also concluded Ms. Kelly suffered from chronic lumbar strain.  Fourth, Ms. Kelly sat for at least two and a half hours during an appointment with Dr. Becker whose examination revealed an "excellent lumbar range of motion" with well performed extension, rotation and flexion, and Dr. Becker's review of MRI data supported a finding of "age appropriate degenerative disc changes."  AR 10468.

In terms of her functional capabilities, these four doctors reached substantially similar conclusions all of which support a finding that Ms. Kelly does not meet the Plan's definition of "total disability."  Dr. Huertas opined Ms. Kelly's back problems were not crippling and he found no reason for her to have a permanent disability.  Despite his diagnosis of chronic low back pain and spinal stenosis, Dr. Ross opined Ms. Kelly was capable of standing and walking off and on for a total of six hours in an eight hour day in 1997.  Similarly, Dr. Mann cleared Ms. Kelly to return to work subject only to the limitation that she not sit or stand for more than two hours without a break.  Dr. Becker diagnosed L5 sacralization and spinal stenosis, but he was "unable to discover anything on a physical exam which would preclude (from a musculoskeletal standpoint) Ms. Kelly from performing any sedentary, semi-sedentary or light work."  AR 10469.

In sum, the objective evidence contained in the reports of the four doctors who examined Ms. Kelly prior to Prudential's decision points decidedly in one direction – Ms. Kelly is capable of performing some sedentary work, at least on a part-time basis.  In light of this evidence, Ms. Kelly did not establish, as of November 1998, that she continued to meet the Plan's definition of "total disability."

The medical evidence post-dating Prudential's November 1998 decision submitted by Ms. Kelly during her appeals process does not compel a contrary conclusion.   Ms. Kelly summarizes the evidence in this way: "Three orthopedic surgeons and a radiologist have opined, based on the January 1999 MRI and x-rays, that Ms. Kelly has progressive degenerative disc disease with spinal stenosis."  Pl.'s Mem. in Supp. of Mot. for Summ. J. at 29.  Again, even assuming this is true, the existence of a medical diagnosis "does not by itself establish disability." *Jordan*, 370 F.3d at 880.  Moreover, this medical evidence merely reaffirms the diagnoses made before 1998 and does not provide any new evidence that Ms. Kelly's functional abilities with the same diagnosis are any more limited after 1998.  Instead, the objective evidence regarding her functional capabilities post-dating the November 1998 decision reaffirm the conclusion that Ms. Kelly is capable of performing sedentary work, at least part-time.  In January 1999, Dr. Jenkins found she had a good range of motion and an unremarkable spinal exam.  AR 10352.  Physical therapist Dave Dery opined she would be employable in the sedentary work range with the accommodation that she be allowed to change her position at will.  *Id*. at 10360.  In July 1999, Dr. Weinstein's physical examination showed normal gait and no localized tenderness or vertebral spasms, with no clear-cut reason for surgical intervention.  In August 2000, an x-ray reviewed by Dr. Jenkins indicated satisfactory alignment in her spine, and by November 2000,

Ms. Kelly reported she was able to walk two miles on most days. After reviewing Ms. Kelly's file in the appeals process, Dr. Brown confirmed the diagnoses of degenerative disc disease, spinal stenosis, L5 sacralization, and chronic low back pain. However, as to Ms. Kelly's functional capacity, Dr. Brown opined the medical evidence supports the conclusion that Ms. Kelly had the capacity to perform sedentary work on a full-time basis with accommodation. *Id*. at 10202.

The one piece of record evidence supporting Ms. Kelly's position is the vocational assessment completed by Ms. Kay Hartgrave in December 2000. Ms. Hartgrave evaluated Ms. Kelly after her back surgery and concluded Ms. Kelly's physical capacity "would not allow her to perform for wage or profit the material and substantial duties of any job since November 1998." *Id*. at 10412. This conclusion is somewhat puzzling given that Ms. Hartgrave indicates Ms. Kelly "demonstrates physical capacities in the sedentary work range," *id*. at 10406, and is "employable in the sedentary work range." *Id*. at 10407. The court will read the assessment as evaluating two different periods, that is, before Ms. Kelly's surgery and after Ms. Kelly's surgery. Read this way, Ms. Hartgrave's opinions actually bolster the conclusion that Ms. Kelly was not "totally disabled" during the relevant time period when Prudential decided to terminate benefits in November 1998.

The court does not find it necessary to address the peripheral argument regarding the retroactivity of the Plan's 24-month mental condition exclusion. Prudential indicates it did not intend to advance this argument. Def.'s Reply at 7. Instead, the court agrees with Prudential's main argument that Ms. Kelly failed to establish her "total disability" because the medical evidence in this record indicates she could perform sedentary work at least on a part-time basis.

III.    CONCLUSION

The medical evidence in Ms. Kelly's claim file as of November 1998 did not demonstrate a basis on which Prudential was obligated to pay continuing LTD benefits under the Plan.  The medical evidence Ms. Kelly presented from after November 1998 does not compel a contrary conclusion.  Instead, the record reflects Ms. Kelly was not totally disabled and could return to employment on at least a part-time basis, as long as the position complied with certain restrictions such as allowing her to change positions to avoid prolonged sitting, standing or walking.

Therefore, after reviewing the entire record *de novo*, the court concludes the objective medical evidence in conjunction with the many opinions supporting her ability to perform sedentary work provide clear support for concluding Ms. Kelly was not "totally disabled." Judgment will be entered in favor of Prudential and this case will be dismissed with prejudice.


IT IS SO ORDERED.

DATED this   18th   day of July, 2006.


                                        /s/ Michael W. Mosman
                                        MICHAEL W. MOSMAN
                                        United States District Court


PAGE 27 - OPINION AND ORDER         27